# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 5, 2010         Decided March 1, 2011

No. 09-5388

MELODI NAVAB-SAFAVI,
APPELLEE

v.

JAMES K. GLASSMAN, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01225)

*Robin M. Meriweather*, Assistant U.S. Attorney, argued the cause for appellants. With her on the briefs were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

*Richard A. Salzman* argued the cause for appellee Melodi Navab-Safavi. With him on the brief were *Carolyn N. Lerner* and *Douglas B. Huron*.

Before: SENTELLE, *Chief Judge*, GARLAND, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: In July 2007, appellee Melodi Navab-Safavi, then a contractor for the Persian News Network of the Voice of America, appeared in a music video that criticized the United States' involvement in Iraq. Voice of America, overseen by the Broadcasting Board of Governors, terminated Navab-Safavi's contract and Navab-Safavi thereafter filed this action against the Board and several of its officials, alleging violations of the First and Fifth Amendments. The defendant officials moved to dismiss on several grounds, including qualified immunity. The district court denied their motions, and the defendant officials filed this interlocutory appeal, contending that the district court erred in its ruling on qualified immunity. For the reasons set out below, we conclude that the district court did not err in denying defendants' motions for dismissal. We therefore affirm the district court's order and remand for further proceedings.

## I.  Background

A. *Factual Background*

We note at the outset that we are reviewing the decision of the district court on a motion to dismiss on the basis of qualified immunity. At that stage of the proceedings, the district court was of course required to assume the truth of all factual allegations in the complaint. *Vila v. Inter-Am. Investment Corp.*, 570 F.3d 274, 278 (D.C. Cir. 2009). Like the district court, our discussion will assume the truth of those allegations and will reflect no conclusions upon their accuracy.

At the time of the events under litigation, plaintiff Melodi Navab-Safavi worked as a contractor with the Broadcasting Board of Governors ("BBG" or "the Board"). The BBG is a federal agency charged with overseeing all U.S. government and government-sponsored, non-military, international broadcasting

services. The BBG oversees Voice of America ("VOA"), which in turn oversees the Persian News Network ("PNN"), formerly called the Persian Service. Navab-Safavi's contract was to provide services to the Persian Service, which produces programs, features, and talk shows in the Farsi language. Navab-Safavi's primary duties were to translate material into Farsi for these productions and to provide "voice-over" services, reading copy already approved by an editor. She also provided technical support for the production of newscasts. All of Navab-Safavi's work was reviewed by a VOA editor or producer. According to a supervisor, she was "not a journalist." She did not create, but rather translated news and feature stories. Although she narrarated some "History Channel" segments, she never appeared on air as a VOA employee, and at her request the VOA did not identify her by name on the air. Her only appearance on a VOA telecast was as a guest performer with her band Abjeez, a pop band that produces songs and music videos.

In early July 2007, Abjeez produced a music video called DemoKracy. The video, which was before the district court by incorporation in the pleadings, protests the United States' involvement in Iraq and depicts casualties of the war, including images of coffins of United States soldiers and of "brutal injuries and deaths suffered by Iraq's civilian population during the war," among them wounded children. The format of the video portrays a television newsroom and two reporters, one of whom is in the newsroom and one of whom is reporting from the field. Navab-Safavi appears in the video as one of the reporters. The video was posted on www.youtube.com and other publicly available internet domains. It was not commercially distributed or sold. VOA resources were not involved in making the video and Navab-Safavi worked on the video only during non-work hours. Appellee admits in her complaint that the video attracted the attention of public officials, including at least two United States Senators.

On July 18, 2007, defendant Mary Poggioli, an official employed by the BBG's Labor Relations Office, met with Navab-Safavi's husband, Saman Arbabi, who helped to produce the DemoKracy video and was employed by the BBG. Poggioli told Arbabi that the BBG had convened to discuss the video and judged it to be anti-American. She said that the BBG thus saw Arbabi as a liability and she pressured him to resign.

The next day, on July 19, 2007, the BBG terminated Navab-Safavi's contract. After learning of her contract termination, Navab-Safavi went to her office to pack her things, at which point Sheila Gandji, Director of the PNN, told Navab-Safavi, "If this had happened in another service, like the Mandarin service, nothing would have happened. But since you are Iranian, working at the Persian service during these sensitive political times with Iran, this has become a disproportionate problem for you." After Navab-Savabi's contract was terminated, defendants hired other contractors to provide the same services that Navab-Safavi had previously performed for the BBG.

On July 17, 2008, Navab-Safavi filed this lawsuit in the United States District Court for the District of Columbia against the BBG and several individuals who were officials at the BBG at the time of her termination, alleging a violation of her First Amendment free speech and Fifth Amendment equal protection rights. All individual defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) on the ground that they were qualifiedly immune from suit, among other grounds. The district court denied the motion in a memorandum opinion, holding that the defendants had not established that they were entitled to qualified immunity. *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 53-65 (D.D.C. 2009). Defendants filed this interlocutory appeal, arguing that the district court erred in denying the motion to dismiss based on qualified immunity.

B. *Legal Background*

Appellant's motion for dismissal is rooted in the well-established doctrine of qualified immunity. This doctrine protects "government officials performing discretionary functions" from civil consequences "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We note at the outset that we have jurisdiction to review this interlocutory appeal on the issue of qualified immunity. Ordinarily, courts of appeals, such as this one, have jurisdiction only over appeals from "final decisions" of the district courts. 28 U.S.C. § 1291. However, there is a small class of interlocutory decisions which carry sufficient finality to afford jurisdiction over an interlocutory appeal. That exception to the usual finality rule includes those cases "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Qualified immunity provides "an entitlement not to be forced to litigate the consequences of official conduct." *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). Therefore, a denial of a motion for dismissal on that ground constitutes a final decision that, if in error, invades the defendant's "entitlement not to stand trial or face the other burdens of litigation." *Id.* at 525, 530. Obviously, such a breach of entitlement could not be effectively reviewed after final judgment. *Id.* at 527.

While appellants contended in the district court and continue to contend before us that the allegations of the complaint do not set forth a violation of appellee's First Amendment rights, they further contend that even if the

complaint otherwise states a claim for relief, the appellants are entitled to qualified immunity. Before we determine the viability of the qualified immunity defense, we first note that our interlocutory jurisdiction extends to the question of the sufficiency of the allegations of the complaint as a necessary antecedent to the qualified immunity question. *See id.* at 529-30 & n.10. We will first review the legal sufficiency of the allegations of violations of appellee's First Amendment rights, after which we will proceed to determine directly the qualified immunity question. We will then address her equal protection claim under the Fifth Amendment.

## II. The First Amendment Claim

Even at the motion stage, this question is not an easy one. It is true that individuals do not "relinquish the First Amendment rights they would otherwise enjoy as citizens" when they accept employment with the government. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). It would also seem fairly evident that if the government took retaliatory action against a private citizen for the production of a video similar to the one before the court, that person's First Amendment rights would be violated. However, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* Therefore, in cases, such as the present one, involving government restrictions on the free speech rights of its employees (here, contractor), we apply a balancing process dictated by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968). *See also Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 673 (1996) (extending *Pickering*'s applicability to include government contractors as well as employees "adjusted to weigh the government's interest as contractor rather than employer").

We summarized the *Pickering* balancing process in *O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998), as follows:

> A public official seeking to make out a claim of retaliation in violation of her First Amendment rights must meet a four-factor test. First, the public employee must have been speaking on a matter of public concern. If the speech is not of public concern, it is unnecessary to scrutinize the basis for the adverse action absent the must unusual circumstances. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees without disruption, outweighs the employee's interest, as a citizen, in commenting upon matters of public concern, and the interest of potential audiences in hearing what the employee has to say. Third, the employee must show that her speech was a substantial or motivating factor in prompting the retaliatory or punitive act of which she complains. And finally, the employer should have an opportunity to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.

*Id.* at 1133 (quotations and citations omitted).

The first two of the four questions set forth above are questions of law for the court to resolve. *Id.* No one disputes that the appellee's video addresses a matter of public concern. Likewise, it is undisputed that her participation was a but-for cause of the BBG's decision to terminate her contract. However, appellants continue to contend, as they did in the district court, that the Board's interest in promoting the efficiency of its provision of public services, and more specifically, in providing the level and sort of service dictated by statute, outweighs appellee's interest in speaking through the

video and the public's interest in hearing that speech.

In support of this weighty interest, appellants point to 22 U.S.C. §§ 1464a and 6202, which together set forth the duties and responsibilities of the Board and the VOA. In its authorization of the BBG, Congress made findings that the "long-term interests of the United States are served by communicating directly with the peoples of the world by television. To be effective, the Broadcasting Board of Governors must win the attention and respect of viewers." 22 U.S.C. § 1464a(b). In furtherance of the interests recognized in those legislative findings, Congress set forth principles to govern television broadcasts presented by Board-governed entities. These principles dictate that, *inter alia*, the VOA "will serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c)(1); that its "news will be accurate, objective, and comprehensive," *id.*; and that it will "present the policies of the United States clearly and effectively" and provide "responsible discussions and opinion on these policies," § 6202(c)(3). *See also* 22 U.S.C. § 1464a(b)(1) (requiring the BBG to follow the principles that it will "serve as a consistently reliable and authoritative source of news" and produce news that is "accurate and objective"). Furthermore, all international broadcasting that VOA and the BBG produce must be "consistent with the broad foreign policy objectives of the United States," 22 U.S.C. § 6202(a)(1), and "in accordance with the highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5).

Briefly put, appellants maintain that Navab-Safavi's appearance in the DemoKracy music video had the potential to damage the government's strong interest in presenting through an organ with the highest journalistic credibility a clear message of United States policy. By participating in the DemoKracy video, Navab-Safavi took a public position on one of the

subjects of VOA's broadcasting, the United States' involvement in Iraq. She thereby raised two potential threats to VOA's journalistic credibility: first, that she would cause VOA to produce biased work and second, that, even if she did not, the public could perceive VOA's broadcasting to be biased because of her editorial role in the agency. If VOA's credibility were compromised in this way, appellants argue, this could hinder the BBG's ability to advance foreign policy. Highlighting that foreign policy is an area in which the government has traditionally received special deference, appellants conclude that they were justified in terminating Navab-Safavi's contract, despite her interest in making the video and the public's interest in viewing it.

It is clear by now that under *Pickering*, its precedents and progeny, the district court correctly ruled that appellee's allegations do state a claim for relief. Continuing to take the allegations of the complaint in the light most favorable to the plaintiff, it is indisputable that she spoke on a matter of public concern and received retaliatory consequence for that exercise of her First Amendment rights. It is further inarguable that the government has presented a weighty interest in support of its authority to take action against that exercise. It is our duty, then, to determine whether the district court erred in holding that plaintiff had stated a claim for relief, and finally, to determine whether the court erred in not affording the protection of qualified immunity to the appellants against the litigation of such claim. We hold that at least at the pleading stage, the district court correctly ruled that the complaint survived the motion.

Taking the allegations of plaintiff's complaint to be true and construing them in the light most favorable to her, as the district court and this court are required to do, her interest in her First Amendment rights was weighed against little government

interest in the protection of its journalistic integrity or reputation for such integrity in the *Pickering* balance. Construing the complaint in the light most favorable to appellee, she exercised no editorial judgment, did not appear on camera, and never purported to speak on behalf of the Board or the United States. It is not likely that the Board would argue that, for example, a janitor or messenger could be discharged for making an anti-American video. In contrast, it might well be that an on-the-air editorialist for VOA or a top executive could be discharged for the same conduct. On the allegations of the complaint, the district court did not err in concluding that appellee fell on the side nearer the role of the janitor than the editorialist or the executive. Will this same view prevail after full discovery and perhaps augmentation by affidavits at the summary judgment stage, or at trial? That remains to be seen. What must be determined now is whether the district court correctly kept the appellants in the litigation until that determination.

As is apparent in the very terminology employed, qualified immunity is not absolute. It protects government officials in civil litigation arising from their official conduct "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. In other words, the immunity protects public officials from civil consequences for their official acts unless the contours of the constitutional right that they are accused of violating are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Appellants argue that appellee has not alleged the violation of such a clearly established right. As they put it, "neither Mrs. Navab-Safavi nor the District Court has identified a single case in which a Court has held that a contractor's or employee's interests in criticizing U.S. foreign policy outweigh the broadcaster's interest in protecting its reputation for

impartial and credible journalism, and maintaining the trust of its audience." While undoubtedly true, that is not sufficient. Even though "in the light of pre-existing law the unlawfulness [of the officer's conduct] must be apparent," *id.*, there is no need that "the very action in question [have] previously been held unlawful," *Wilson v. Laid*, 526 U.S. 603, 615 (1999). It cannot be gainsaid that a person expressing her viewpoint is exercising an established constitutional right. While in this case it may ultimately be established that the governmental interest involved was sufficient to outweigh that right and allow the officials to take action, it is not sufficiently established at this stage to have required the district court to uphold the assertion of qualified immunity and dismiss the action.

Having established that the complaint set forth a violation of right requiring a *Pickering* balancing against the appellants' assertion of qualified immunity, we now face a question similar to that determined by the Fifth Circuit in *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004): That is, given the function of qualified immunity in protecting government officials against not only civil liability, but the burden of litigation, did its assertion by the appellants require the district court to terminate the litigation at the motion stage without further resolution of the factual questions underlying the determination of the *Pickering* balance? Upon review of the record, we conclude as did the district court that it is not possible to determine at this stage as a matter of law that Navab-Safavi has not alleged a violation of clearly established law. All the district court had before it and all we have of record is the Board's assertion that its interest in performing its governmental functions and carrying out its statutory mandates was sufficiently implicated by plaintiff's conduct to warrant the protection of qualified immunity. As another of our fellow circuits has held, "qualified immunity cannot be based on a 'simple assertion by [appellants] without supporting evidence' of the adverse effect of the speech on [the

governmental function].” *Shockency v. Ramsey Cnty.*, 493 F.3d 941, 949-50 (8th Cir. 2007) (quoting with modification *Grantham v. Trickey*, 21 F.3d 289, 295 n.4 (8th Cir. 1994)). We agree. We face the same circumstance here. Granted, the Eighth Circuit in *Shockency* was reviewing a summary judgment decision, while we review a 12(b)(6) ruling. Ordinarily, evidentiary demands do not become evident until the summary judgment stage. However, where the interests underlying the *Pickering* balancing are as fact-dependent as those in this case, the district court appeared to correctly determine that this decision could not be made at the 12(b)(6) stage and should properly await some evidentiary development. We do not suggest that the determination can never be made on allegations—the relative weight of governmental interest and established constitutional rights on other facts may often be quite evident from the pleadings—but only that it cannot be done on the record before the court in this case.

Neither the district court nor this court has evidence in the record that appellee's conduct interfered with the performance of the governmental function, including the carrying out of the statutory mandates. We have only allegations, and the allegations of the parties are in conflict. At summary judgment or at trial, these conflicts may be resolved on an evidentiary record. At the stage of the motion to dismiss, they cannot. We must take the allegations in the light most favorable to the plaintiff. She stated a claim for violation of her First Amendment rights. The Board asserts its qualified immunity, but we are unable to determine without an evidentiary record whether any act it committed in defense of those functions constituted a violation of clearly established rights, or even in general terms, where the *Pickering* balancing tips.

We therefore conclude that the district court did not err in denying the motion to dismiss, and we remand the claim for

further proceedings consistent with this opinion.

### III.  The Fifth Amendment Claim

As to the alleged Fifth Amendment claim, a similar analysis applies.  The sufficiency of the allegations of the complaint is perhaps not as clear as was the case with the First Amendment claim.  It is true that the Due Process Clause of the Fifth Amendment forbids the federal government from denying equal protection of the laws.  *See, e.g.*, *Davis v. Passman*, 442 U.S. 228 (1979); *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976).  If the retaliatory action against appellee was based upon her ethnicity or national origin, then she has stated a claim.  The question then becomes:  Has she adequately alleged such a claim?  Arguably, she has not.  She has not in precise terms alleged that her contract would not have been terminated had she not been Iranian.  She has alleged only that one supervisor, not alleged to be a decisionmaker, told her that had she not been "an Iranian, working at the Persian Service during these sensitive political times," nothing would have happened.  It is thus not apparent that even the single supervisor was stating that her ethnicity or national origin, as opposed to the service in which she worked, was the basis of the termination.  However, taking the allegation in the light most favorable to the plaintiff, her complaint is susceptible to the interpretation that her contract was terminated "because of" her ethnicity or national origin.  Whether this is more than a mere allegation can be tested at further stages of the litigation when an evidentiary record will support a definitive resolution of the open questions.

We further note that in addition to the weakness of this claim on the "because of" element, the complaint alleges no acts by the individual appellants.  We recall that in actions against public officials for violation of constitutional rights, "officials may not be held liable for the unconstitutional conduct of their

14

subordinates under a theory of *respondiat superior*." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009). We suggest that on remand, if the case is to proceed against the individual appellants, as opposed to the Board of Governors, the district court may wish to permit amendment to the complaint or reconsider the individual appellants' motions to dismiss. With that proviso, we affirm the district court's order denying the motion under Rule 12(b)(6) and remand for further proceedings.

## Conclusion

For the reasons set forth above, the order of the district court is

*Affirmed.*