ROGERS, Circuit Judge,
dissenting:
From the unremarkable fact that Congress was aware that it was not including employees of the Legislative Branch in the remedial provisions of the Civil Service Reform Act of 1978 (“CSRA”), Pub. L. No. 95^154, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), the court concludes that “Congress consciously, ‘not inadvertently’ omitted remedies” for Library of Congress employees, and thus the CSRA precludes a Bivens[1] remedy for Col. Morris D. Davis. Op. at 386. The premise of the court’s holding is that when Congress enacts a remedial scheme for a specific group of claimants, it is making a conscious decision not to enact a remedial scheme for other claimants, regardless of how far beyond the intended scope of the enacted scheme those other claimants are, and even in the absence of any evidence demonstrating Congress chose to exclude them because it did not want them to have a remedy at all. There is no limiting principle to this theory, and in adopting it, the court allows the “special factor” exception to swallow the rule. The Supreme Court has not gone so far, see Minneci v. Pollard, — U.S.-, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012); nor should we.
The court ignores the real question in this case — why did Congress exclude Leg *389 islative Branch employees? The answer, found in the unambiguous legislative history of the CSRA and the Congressional Accountability Act of 1995,'Pub. L. No. 104-1, 109 Stat 3 (codified at 2 U.S.C. §§ 1301-1438), is that Congress, based on separation of powers principles, did not want the Executive Branch to have the power to adjudicate claims of Legislative Branch employees — a motivation that says nothing about what Congress intended with respect to Legislative Branch employee Bivens claims. Indeed, the legislative history of the Congressional Accountability Act demonstrates that Congress expressly concluded that judicial adjudication posed none of the same separation of powers concerns. Because Congress did not “intentionally withhold a remedy,” Wilson v. Libby, 535 F.3d 697, 709 (D.C.Cir.2008), from Library of Congress employees by enacting the CSRA, and neither it nor the Congressional Accountability Act constitutes special factors counseling hesitation in recognizing a Bivens action, I would affirm the district court’s ruling that Davis stated a valid Bivens claim. Accordingly, I respectfully dissent.
I.
In Bivens, the plaintiff alleged that federal officials conducted an unlawful search and seizure in violation of the Fourth Amendment to the Constitution, and the Supreme Court held that the federal officials could be sued for violating his constitutional rights, reasoning that “[hjistorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty.” 403 U.S. at 395, 91 S.Ct. 1999. To determine whether a complaint states a valid Bivens claim, the Court has instructed that the first question is “whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.” Minneci, 132 S.Ct. at 621 (quoting Wilkie v. Robbins, 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007)) (alteration in original). Absent an alternative remedy, the question is whether “any special factors counsel! ] hesitation before authorizing a new kind of federal litigation.” Id. (quoting Wilkie, 551 U.S. at 550, 127 S.Ct. 2588).
One such special factor is where Congress, although not explicitly foreclosing a damages action, has provided “recourse to ‘an elaborate, comprehensive scheme,’ ” Wilkie, 551 U.S. at 575, 127 S.Ct. 2588 (quoting Bush v. Lucas, 462 U.S. 367, 385, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)), such that recognition of a Bivens action would “interfere with Congress’ carefully calibrated system.” Id. This is the question presented by the complaint, which alleges that the Librarian and Davis’s supervisor violated his First and Fifth Amendment rights under the Constitution when he was fired from his position as Assistant Director of the Foreign Affairs, Defense, and Trade Division, in the Congressional Research Service (“CRS”) at the Library of Congress after an article and letter to the editor criticizing the Obama and Bush Administrations’ handling of Guantanamo detainee trials were each published in a newspaper.
A.
The court views the fact that Library of Congress employees are excluded from the CSRA’s remedial scheme for personnel actions, see 5 U.S.C. §§ 2301(a), 4301(1), & 7511(a)(l)(B)(i), as evidence that Congress intentionally withheld a remedy from them, and thus the CSRA constitutes a “special factor” precluding a Bivens action for Davis. Op. at 383-86. Although the exclusion of Library employees is disposi- *390 tive in this case, it demands the opposite result. Contrary to the court’s conclusion, see Op. at 384, the Congress that enacted the CSRA did not “define” the scope of the civil service and then limit remedies to Executive Branch employees in one deliberative, fell-swoop. Instead, more than a decade before enacting the CSRA, Congress enacted the “Definitions” section of Title 5, Chapter 21 of the U.S.Code “to establish a basis of reference” “for convenience” when referring to federal employees. S. Rep. No. 89-1380, at 46-47 (1966); H.R. Rep. No. 89-901, at 26-27 (1966).[2] No evidence suggests that Congress intended anything about what remedies should be available to Library employees when it enacted the CSRA; it was addressing the altogether different question of how to provide a fair system for adjudicating remedial claims within the Executive Branch civil service. That Library employees are in the “excepted service” as a matter of vernacular convenience adds nothing to the analysis. Congress did not view itself as legislating on what remedies should be available to Library employees when it enacted the CSRA and it is thus irrelevant to the “special factors” analysis.
Stewart v. Evans, 275 F.3d 1126 (D.C.Cir.2002), illustrates this point. In Stewart, a federal employee filed a Bivens action against her employer for an alleged unlawful search in violation of the Fourth Amendment. Id. at 1129. This court reasoned that the CSRA did not preclude the Bivens action because “a warrantless search is not a ‘personnel action[ ] ... covered by this system’ and [thus] such a search does not fall ‘within the statutory scheme.’ ” Id. at 1130 (quoting Bush v. Lucas, 462 U.S. 367, 385 n. 28, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)). The court noted that “Bush virtually compels the conclusion that the [CSRA] does not preclude a Bivens action for a warrantless search.” Id. Stewart thus stands for the proposition that where a claim is outside the scope of a remedial scheme, such that Congress did not envision itself as legislating on the subject of that claim, the remedial scheme does not preclude a Bivens action based on that claim.
*391 This principle applies with equal force here, where Davis is a claimant who is outside the scope of the remedial scheme, such that Congress did not envision itself as legislating about the remedies available to that claimant. “The [CSRA] is not concerned with the conduct of which [he] claims,” id., that is, violation of constitutional rights of a Legislative Branch employee. Stewart reflects the appropriate limiting principle to the proposition that “a comprehensive statutory scheme precludes a Bivens remedy even when the scheme provides the plaintiff with no remedy whatsoever.” Wilson v. Libby, 535 F.3d 697, 709 (D.C.Cir.2008) (internal quotation marks and citations omitted). A specific claimant or a specific claim must be “within the statutory scheme,” Bush v. Lucas, 462 U.S. 367, 385 n. 28, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), such that Congress withheld a remedy for the conscious purpose of denying one, in order for the scheme to preclude a Bivens action for that claimant or claim.
The Supreme Court’s precedent holding that a comprehensive remedial statutory scheme precludes a Bivens action reflects this limiting principle. For example, in Bush, 462 U.S. at 386, 103 S.Ct. 2404, the Executive Branch federal employee’s claims were “fully cognizable” by the Civil Service Commission’s “elaborate, comprehensive scheme.” In Schweiker v. Chilicky, 487 U.S. 412, 425, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Social Security disability beneficiaries and their claims were within the “considerably more elaborate,” id. at 424, 108 S.Ct. 2460, remedial scheme enacted by Congress, even though it did not provide “complete relief,” id. (internal quotation marks and citation omitted). Similarly, in Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 71-73, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), the prisoner’s claims were covered by “alternative remedies [ ] at least as great, and in many respects greater, than anything that could be had under Bivens.” The Court’s most recent discussion of Bivens in Minneci, 132 S.Ct. at 626, adheres to this approach, holding that a federal prisoner in a private correctional facility had no Eighth Amendment Bivens claim where the alleged “conduct is of a kind that typically falls within the scope of traditional state tort law.”
Until recently, this court has followed suit. For example, in Spagnola v. Mathis, 859 F.2d 223, 225 n. 3 (D.C.Cir.1988), the en banc court concluded that the constitutional claims of the Executive Branch employees were covered by the CSRA, and thus they were within the scope of the remedial scheme. In Wilson, 535 F.3d at 707, the court stated that “each Constitutional claim, whether pled in terms of privacy, property, due process, or the First Amendment, is a claim alleging damages from the improper disclosure of information covered by the Privacy Act.” Id. But see id. at 713 (Rogers, J., dissenting). On the basis of unambiguous legislative history, the court concluded that Congress intentionally excluded the President, Vice-President, and their staffs as possible defendants for Privacy Act claims. Id. at 708. I dissented from the court’s holding in Wilson, and continue to disagree with its analysis. Yet in Wilson the court at least sought to determine, through legislative history, whether Congress acted with the purpose of withholding a remedy for claims against such defendants premised on the release of information covered by the Privacy Act. See id. In all of these cases, the alternative remedies or the remedial scheme at issue covered either the claimants or their claims, such that they were “within the statutory scheme,” Stewart, 275 F.3d at 1130 (internal quotation marks and citation omitted), or the court concluded that legislative history demonstrated Congress excluded claims or claim *392 ants for the purpose of withholding all remedies, and thus a Bivens remedy could be precluded.
The court today acknowledges that this limiting principle “is not a novel theory,” Op. at 387, but its response misses the point of the principle altogether. The court reasons that Davis’s claim would be covered by the CSRA, but as a claimant he is not, and thus he is not outside the “outer boundary” of the CSRA’s scope. See Op. at 387-88. Whenever the limiting principle is implicated, either a claim (but not the claimant) or a claimant (but not the claim) will be covered by the remedial scheme; otherwise there would be no need to consider whether the “outer boundary,” Spagnola, 859 F.2d at 229, of the remedial scheme has been breached. The difficulties arise precisely where one, but not both, is included. Under the court’s logic, Stewart’s limiting principle would not have applied in Stewart itself, where a federal employee (the claimant) was covered by the CSRA, but her Fourth Amendment claim, premised on work-site actions, was not. The court’s analysis restates the obvious fact Davis is not an Executive Branch employee, and from that somehow concludes that there was “a considered congressional judgment that [] remedies for [non-Executive Branch employees] are not warranted.” Op. at 388. The analysis of whether the limiting principle should apply, however, depends on why Congress excluded either the claimant or the claim. If it acted with the purpose of preventing a remedy altogether, then the Stewart limiting principle is inapplicable. If it did so for reasons unrelated to a desire to remove all remedies, then Stewart applies.
The court does not bother to pose, let alone answer, this question, ignoring that both Wilson and Spagnola consulted the legislative history of the remedial scheme to ascertain the “outer boundaries for inclusion in ‘comprehensive systems,’ ” Spagnola, 859 F.2d at 229. In Wilson, the court’s determination that the Privacy Act, 5 U.S.C. § 552a, was a “special factor” precluding a Bivens action for both Wil-sons’ claims against the President, the Vice-President, and their staff was based on what the Supreme Court viewed as “ ‘unambiguous’ legislative history” that “Congress did not inadvertently omit the Offices of the President and Vice President from the Privacy Act’s disclosure requirements.” Wilson, 535 F.3d at 708 (quoting Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 156, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980)). In Spagnola, a case involving whether the CSRA precluded a Bivens action for constitutional claims of Executive Branch employees, the en banc court “f[ou]nd nothing in the legislative history suggesting that Congress’ omission of a damages remedy in the CSRA was anything but adver-tent,” 859 F.2d at 229, “nor ... discern[ed] any clear expression of congressional intent that the courts preserve Bivens remedies,” id. The court noted that “[t]he most that can be said for the legislative history of the CSRA is that Congress did not expressly intend to eliminate damages remedies” for Executive Branch employees, observing the “ ‘explicit congressional declaration’ exception to allowing damages remedies ... has little relevance to the ‘special factors’ exception after Chilicky.” Id. at 229 n. 10 (emphasis in original).
The question here is not whether Congress’s omission of a damages remedy in the CSRA was advertent, but whether Congress’s omission of Library of Congress employees from coverage under the CSRA demonstrates a conscious choice that such employees not have a Bivens remedy, or instead whether such employees are simply outside the scope of the question Congress was addressing in en *393 acting the CSRA, making the CSRA irrelevant to the Bivens analysis, as it was in Stewart. See 275 F.3d at 1130. The legislative history of the CSRA demonstrates the latter. In adopting the CSRA, Congress focused on reforming the “civil service system” of the “executive branch.” H.R.Rep. No. 95-1403, at 3 (1978), reprinted in House Comm, on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Civil Service Reform Act of 1978, at 640 (Comm. Print 1979). The CSRA thus included “general policies of the merit system principles applicable to the competitive civil service and throughout the executive branch,” id. at 4, providing guidance for “all Executive agencies to follow,” id. Congress’s plain intent was to reform the employment practices of the Executive Branch.
The legislative history of the CSRA confirms that Legislative Branch employees were excluded from the CSRA’s remedial provisions not because Congress wished to express its intent that they have no remedies available, but instead because of separation of powers concerns. During the conference committee mark-up session, the House and Senate Members agreed that the Library of Congress, the Government Accountability Office (also in the Legislative Branch), and the Administrative Office of the Courts (in the Judicial Branch), would not be required to seek allotments of “supergrade” positions from the Office of Personnel Management in the Executive Branch. These offices would “retain the supergrade allocations that they have on the theory that they are not in the Execu-five Branch and that the President or the personnel manager for the President should not have the power to shift those supergrades around. The [CJongress ought to retain that power.” The Civil Service Reform Act of 1978: Joint Conference of the Senate Commit tee on Governmental Affairs and the House Commit tee on Post Office and Civil Service, 96th Cong. 22 (Sept. 26, 1978), reprinted in House-Senate CONFERENCE MARKUP Session on Civil Servioe Reform Act of 1978, Senate Comm, on Gov’t Affairs and House Comm, on Post Office and Civil Service (1978) (statement of Rep. Udall). As one Senate Conferee put it, “we feel so strongly about the separation of powers principle.” Id. (statement of Sen. Percy).
Although Congress was aware it was not extending the CSRA’s remedial scheme, which is administered by the Executive Branch, to Library employees, see Op. at 383-86, this conclusion is only half the analysis. The reason for the exclusion reflected in the legislative history — the protection of the separation of powers— demonstrates that Congress did not view itself as legislating on the subject of what remedies should be available to Library employees, and in excluding Library employees from CSRA coverage did not “intentionally withh[o]ld a remedy,” Wilson, 535 F.3d at 709. The Stewart limiting principle therefore applies in Davis’s case.
B.
Likewise, the Congressional Accountability Act does not preclude a Bivens action in this case.[3] Most of its provisions do not apply to the Library of Congress, be *394 cause “the Library of Congress[4] [was] already covered by antidiscrimination and employee protection laws.” S.Rep. No. 103-397, at 2 (1994); 2 U.S.C. § 1302.[5] The House Floor debate indicates that its purpose was to make Congress abide by the same anti-discrimination laws that apply to the private sector, see, e.g., 114 Cong. Rec. 264-65 (statement of Rep. Goo-dling, chairman of the House Committee on Economic and Educational Opportunities), and that there was no consideration or rejection of a remedial scheme to address constitutional claims of Library employees — claims that do not exist against private employers. The Senate deliberations of the Congressional Accountability Act demonstrate Congress’s consistent concern with protecting separation of powers in managing Legislative Branch employment affairs, supporting the conclusion that both the Accountability Act and the CSRA are irrelevant to the question before the court.
To authorize executive branch agencies to enforce antidiscrimination and employment laws against Congress would create a dangerous entanglement between these two branches of government. The legislative branch must be free from executive branch intimidation, real or perceived.... To maintain the necessary separation of powers, the Committee [on Governmental Affairs] determined that it is essential to maintain independence from the executive branch.
5.Rep. No. 103-397, at 6 (1994).[6] “On the other hand,” in extending judicial review to congressional employee claims,
separation-of-powers concerns that make executive-branch enforcement unacceptable are not applicable to [federal] district court actions. Courts and judges do not have the complex interactions with Congress that executive agencies have, so the risk of intimidation would not arise.
Id. at 8.[7]
*395 A Bivens action cannot sensibly be precluded where Congress has expressed no view whatsoever on what remedies should be available for First Amendment violations and where, in extending remedies for other claims, it has expressed its desire that the judiciary resolve claims. See 2 U.S.C. §§ 1404, 1407-09. Although Congress restricted some employment claims from judicial review, it only did so for claims arising under the Accountability Act, which Davis’s First Amendment claim does not.[8] Furthermore, Congress’s inclusion of a provision in the Congressional Accountability Act calling for a study to determine if the rights, protections, and procedures for Library employees were “comprehensive and effective,” 2 U.S.C. § 1371(c), supports the conclusion that Congress had not, in either it or the CSRA, indicated what remedies it thought should be available to Library employees for alleged violations of their First Amendment rights. The Congressional Accountability Act, therefore, is not a special factor precluding a Bivens action by Davis.
C.
Davis’s Bivens action also is not precluded by the fact that he was a probationary employee when he was fired. See Appellant’s Br. at 58 (citing Library of Cong. Reg. 2020-3.1, § 3(1)(1)); Compl. ¶ 55. The Library can point to no reason his probationary status should be a “special factor” precluding a Bivens action. The Library’s internal regulations and policies are not part of the record, nor publically available, and its regulation on providing assistance without partisan bias and policy on outside activities, which are part of the record, do not constitute a “comprehensive scheme” that would preclude a Bivens ac *396 tion; neither the Supreme Court nor this court has held the availability of injunctive relief, see Op. at 388 n.l, is such a “comprehensive scheme,” see, e.g., Farmer v. Brennan, 511 U.S. 825, 831, 845-47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Even assuming the brevity of Davis’s eleven months’ employment at the Library would affect the amount of damages he could recover for a constitutional violation, it does not qualify as a “special factor” suggesting he does not have a remedy.[9] And assuming Library regulations provide for termination of probationary employment for many reasons, Supreme Court precedent is clear that the exercise of free speech rights may not be among those reasons.[10]
D.
The court observes that “in most instances the judgment has been that Congress, not the judicial branch, is in the best position to prescribe the scope of relief available for the violation of a constitutional right.” Op. at 381. In this instance, however, Congress (acting through the Library) is the defendant alleged to have violated its employee’s constitutional rights. In Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), a female congressional staffer whose employment was terminated because of her gender, had no statutory cause of action because Congress had exempted itself from Title VII, id. at 247, 99 S.Ct. 2264. With three exceptions relevant to the Library, see supra n.5, only upon enactment of the Accountability Act did Congress extend application to itself of some employment laws, and then only those applicable to the private sector, necessarily excluding First Amendment constitutional claims. In the sixteen years since Congress received the mandated study[11] of whether the rights, protections, and procedures for Library employees were “comprehensive and effective,” 2 U.S.C. § 1371(c), Davis’s supervisor (Daniel P. Mulhollan) does not suggest Congress has addressed how constitutional claims of Library employees should be resolved. The Supreme Court has long acknowledged the Judicial Branch’s competence to review congressional employment decisions:
*397 [JJudicial review of congressional employment decisions is constitutionally limited only by the Speech or Debate Clause of the Constitution.... [W]e conclude that if respondent is not shielded by the Clause, the question whether his dismissal of petitioner violated her Fifth Amendment rights would ... require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a lack of respect due a coordinate branch of government, nor does it involve an initial policy determination of a kind clearly for non-judicial discretion.
Davis, 442 U.S. at 235 n. 11, 99 S.Ct. 2264 (internal quotations, citations, and alterations omitted); see S.Rep. No. 103-397, at 7-8.
Other special factors do not counsel against recognizing Davis’s Bivens action. Wilkie, 551 U.S. at 537, 127 S.Ct. 2588, is instructive. There, the plaintiff alleged various private property and tort-like invasions by federal employees, which the Court characterized as “death by a thousand cuts.” Id. at 555, 127 S.Ct. 2588. The Court explained that he “ha[d] an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints,” id. at 553, 127 S.Ct. 2588, which created “no intuitively meritorious case for recognizing a new constitutional cause of action, but neither ... plainly answer[ed] no to the question whether [the plaintiff] should have it,” id. at 554, 127 S.Ct. 2588. Upon weighing the reasons for and against recognizing a right (the Bivens step two question), the Court concluded in view of “the serious difficulty of devising a workable cause of action,” where “[a] judicial standard to identify illegitimate pressure going beyond legitimate hard bargaining would be endlessly knotty to work out,” that any damages remedy against the Executive Branch employees “who push too hard for the Government’s benefit” against a private property owner’s rights would “come better, if at all, through legislation.” Id. at 562, 127 S.Ct. 2588. No such difficulty exists here, for Davis’s claim rests on a claimed violation of his liberty interests that are protected under the First and Fifth Amendments. See infra Part II. A.
In fact, in Wilkie the Court contrasted the facts of that case with that of “an employee who spoke out on matters of public concern and then was fired,” id. at 556, 127 S.Ct. 2588, where “the outcome turns on “what for’ questions: what was the Government’s purpose in firing him and would he have been fired anyway? Questions like these have definite answers, and we have established methods for identifying the presence of an illicit reason,” id. These are the questions posed by Davis’s Bivens claim. Furthermore, that the Supreme Court indicated a federal employee suing for termination in violation of the First Amendment would be a candidate for a Bivens action underscores the court today has gone too far, effectively holding that the CSRA precludes all federal employee Bivens actions for termination of employment in violation of the First Amendment. Yet the only way to give meaning to the Supreme Court’s statement in Wilkie, given that the Court has held such claims by Executive Branch employees are precluded, see Bush, 462 U.S. at 386, 103 S.Ct. 2404, is to conclude that the Court, just five years ago, implied that Bivens actions would not be so precluded for employees of the other branches, not covered by the CSRA. Although the Supreme Court has recognized Bivens actions in only a few instances, see Op. at 380-81, this likely reflects the proliferation of comprehensive remedial statutory schemes, not a conclusion that there should be no Bivens action in the absence *398 of such a scheme covering the claimant. See id. at 576, 127 S.Ct. 2588 (quoting Carlson v. Green, 446 U.S. 14, 18, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)) (Ginsburg, J., concurring and dissenting in part). But see Minneci, 132 S.Ct. at 626 (Scalia, J., joined by Thomas, J., concurring). Courts must
presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights.
Passman, 442 U.S. at 242, 99 S.Ct. 2264.
For these reasons, “the court’s decision is not the product of the application of the Bivens doctrine to [Davis’s] claims,” but instead a “refusal to acknowledge precedent [holding] that Bivens is a remedial doctrine,” Wilson, 535 F.3d at 722 (Rogers, J., dissenting), and here that Congress has said nothing about what remedies should be available to Library employees for the alleged constitutional violations. With today’s decision, the court goes beyond Wilson, where it “cede[d] to Congress the judiciary’s defined role to decide issues arising under the Constitution,” id., and now abandons the judiciary’s role even where all evidence regarding purpose demonstrates that Congress did not envision itself as legislating on the question now before the court. Contrary to the precedent of the Supreme Court and this court, the court turns the Bivens doctrine on its head to require some “special factor” in favor of recognizing a Bivens claim. Whatever “deference to the informed judgment of Congress,” Op. at 382, is appropriate with respect to Executive Branch remedial schemes, see Bush, 462 U.S. at 389, 103 S.Ct. 2404, where Congress is alleged to violate employee rights, Congress itself recognized that Judicial Branch review does not pose the same separation of powers concerns as does Executive Branch review, see S.Rep. No. 103-397, at 7-8, a sufficient special factor favoring recognizing a Bivens remedy.
II.
In moving to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), Daniel Mulhollan, who was Davis’s supervisor at the CRS and fired him, asserted the defense of immunity. On appeal, he maintains that he is entitled to qualified immunity in part because the potential harm to the CRS from Davis’s two opinion pieces “was clear from the complaint and the documents incorporated by reference,” and he “did not need to develop an evidentiary record.” Appellants’ Reply Br. at 18. Taking Mulhollan at his word, his immunity defense would fail, but a remand for fact finding is required.
A.
The “necessary antecedent” question to deciding the immunity question is the sufficiency of the complaint’s allegations to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). See Navab-Safavi v. Glassman, 637 F.3d 311, 315 (D.C.Cir.2011). Upon de novo review of a denial of a motion to dismiss, and accepting, as the court must, the factual allegations in the complaint as true, Daniels v. Union Pac. R.R. Co., 530 F.3d 936, 940 (D.C.Cir.2008), Davis’s complaint manifestly “contain[s] sufficient factual matter ... to ‘state a claim to relief that is plausible on its face.’” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 *399 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).
1. Based on the analysis in Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), this court has developed a four-part test for determining whether an employee’s First Amendment rights have been violated. See O’Donnell v. Barry, 148 F.3d 1126, 1133 (D.C.Cir.1998).[12] Mulhollan wisely limits his challenge to the second factor, maintaining that Davis compromised his appearance of objectivity and harmed their working relationship, but that too fails.
The Supreme Court has observed that a “stronger showing [of governmental harm] may be necessary if the employee’s speech more substantially involved matters of public concern.” Connick v. Myers, 461 U.S. 138, 152, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). That case involved a workplace questionnaire of little public interest. Id. at 151-52, 103 S.Ct. 1684. Speech about government policies, on the other hand, is a “paradigmatic matter of public concern.” Sanjour v. EPA, 56 F.3d 85, 91 (D.C.Cir.1995) (internal quotation marks, citation, and alteration omitted). To establish governmental harm where a high level policy maker is involved “[a]t a minimum, the employee’s speech must relate to policy areas for which he is responsible.” Hall v. Ford, 856 F.2d 255, 264 (D.C.Cir.1988). Further, the “simple assertion by [The Library and Mulhollan] without supporting evidence of the adverse effect of the speech on” CRS’s function is inadequate. Navab-Safavi, 637 F.3d at 318 (internal quotation marks and citation omitted).
In Pickering, 391 U.S. at 569-70, 88 S.Ct. 1731, the court concluded that there was no threat to harmony between the employee, co-workers, and the supervisor where “[t]he statements [were] in no way directed towards any person with whom [the employee] would normally be in contact.” The Court emphasized that the public had a strong interest in being exposed to the viewpoints of teachers on issues of school funding: “Teachers are, as a class, the members of a community most likely to [be] informed.... [I]t is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.” Id. at 572, 88 S.Ct. 1731. Davis’s two opinion pieces, relying on his professional experience prior to his employment with CRS, were not directed at Mulhollan, the Library, the CRS, or any member of Congress. Compl. ¶¶ 47, 50. In each he was identified as a former chief prosecutor for military commissions at Guantanamo; as such Davis was likely one of the more informed persons who could speak publically on the issue. The public interest in being exposed to his speech is high.
Moreover, Mulhollan concedes that at CRS Davis had no authority over military commission issues. Rather, he maintains that because the same congressional committees oversee both defense issues within Davis’s purview and military commissions, the issues are related enough. But even if Davis can properly be viewed as a “policymaker,” which he disputes, the court in *400 Hall was clear that the relation to the policymaker’s work area is a “minimum” requirement to show government harm. Davis’s complaint states that Members of Congress were aware that the American Law Division, and not his division, was responsible for issues relating to military commissions, see Compl. ¶ 32. Davis’s name has not appeared on any reports to Congress about military commissions, and no congressional inquiries have been directed to him on that subject. Id. ¶ 29. Cf. Rankin, 483 U.S. at 390-91, 107 S.Ct. 2891 (whether employee serves in “public contact role” relevant to government harm inquiry).
Furthermore, “the fact that [Davis’s] criticism was cumulative ... diminish[es] the harm it caused.” O’Donnell, 148 F.3d at 1138. Not only had Davis spoken pub-lically on military commissions with the CRS’s knowledge and was never questioned about those activities, Compl. ¶¶ 33-40, unlike the employee in O’Donnell, his criticism was not aimed at his employer or the Congress. The Library encourages outside speech by its employees, id. ¶¶ 65, 68-69; see Library of Congress Regulation 2023-3, section 3 (Mar. 23, 1998); CRS Policy on Outside Speaking and Writing (Jan. 23, 2004), minimizing any potential government harm. Former CRS employees at the Library of Congress have recounted, without contradiction, the tradition of the independent expert analysts at CRS speaking publically on controversial issues of concern to Congress. See Br. of Amici Curiae Dr. Louis Fisher and Mr. Morton Rosenberg, at 15-17. Davis included no disclaimer in the two published pieces, see LCR 2023-3, section 3(B), but neither did he purport to speak, based on his pre-Library employment experience, for anyone other than himself, and the newspapers identified him only as the former chief prosecutor for military commissions who had retired from the military in 2008.
Although Mulhollan claims, pointing to his letter of admonishment to Davis, that his relationship with Davis became strained as a result of Davis’s published article and letter, that “simple assertion ... without supporting evidence of the adverse effect of the speech on [the CRS’s functions]” is inadequate. Navab-Safavi, 637 F.3d at 318 (internal quotation marks and citation omitted). Otherwise, as Davis suggests, there would be nothing to stop employers from pretextually claiming harm in order to shield themselves from liability. The district court concluded the instances to which Mulhollan pointed, which he initiated, were examples of everyday employer/employee interactions. Mul-hollan’s more plausible suggestion might be that the two opinion pieces damaged the non-partisan reputation of the CRS. But Davis’s article and letter to the editor do not take a partisan position, instead criticizing decisions and officials in both Democrat and Republican administrations. His situation is in that respect unlike the CRS analyst in Keeffe v. Library of Congress, 777 F.2d 1573, 1576 (D.C.Cir.1985), who attended a partisan political convention, and such a partisan label cannot be ascribed to Davis’s speech.
2. Davis’s complaint also states a plausible claim under the Due Process Clause of the Fifth Amendment. The Library’s policies and actions must provide Davis a “reasonable opportunity to know what is prohibited.” Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). This requires that “the Library ... give loud and clear advance notice when it ... decide[s] to interpret a particular regulation as a prohibition or limitation on an employee’s outside activity.” Keeffe, 777 F.2d at 1583.
*401 In Keeffe, the CRS analyst was disciplined for attending a partisan political convention under a Library regulation regarding the potential conflict of interest posed by employees engaging in political activities. Id. at 1576. Although the court upheld the regulation (LCR 2023-7, “Unrestricted Political Activities of Library Employees”) as facially valid and not im-permissibly vague, id. at 1579-81, the court found that, as applied to Keeffe, the Library violated her due process rights, id. at 1582. She had previously attended a 1974 partisan convention without Library complaint; between 1972 and July 1980 the Library had denied no requests by an employee for clearance to engage in a political activity, id.; the Library did not inform Keeffe that it had denied her request until after she had left for the 1980 partisan convention, id. at 1576. “In light of this background, the Library’s course of dealing with her in the summer of 1980 was insufficient to place Keeffe on notice that the prior interpretation [of the regulation] had changed.” Id. at 1582.
So too here. The Library’s Policy encourages outside speaking by its employees; Mulhollan had previously approved Davis’s requests to speak and write on the topic of military commissions, see Compl. ¶¶ 33-38; Davis had made public statements in the past similar to those published in the two newspapers, id. ¶ 36; Mul-hollan had never previously told Davis that his outside speaking on the topic of military commissions was harmful to the Library, the CRS, or was prohibited, id. ¶ 40. As in Keeffe, Mulhollan and the Library’s “course of dealings,” 777 F.2d at 1582, “entitled [Davis] to read the Library’s overly long silence as assent,” id. at 1583.
The responses by the Library and Mul-hollan are unpersuasive. Although they maintain that as a probationary employee Davis had no property interest in his job, see Piroglu v. Coleman, 25 F.3d 1098, 1104 (D.C.Cir.1994), Davis’s due process claim is based on the violation of his liberty interest in free speech. Among the reasons government employees may not be terminated without violating their due process rights is for their protected interest in the right to speak. See supra Part I.C. Further, Davis is not challenging the Library’s exercise of discretion not to have disciplined him for his previous outside speaking, but Mulhollan’s termination of his employment without “loud and clear advance notice,” Keeffe, 777 F.2d at 1583, given the Library’s previous course of dealing, that his conduct could be punished. Mulhollan assented to Davis’s previous speaking engagements, see Compl. ¶¶ 34-35, and he terminated Davis’s employment because of his speech. Regardless of whether Mulhollan had personally caused “the Library’s overly long silence,” Keeffe, 777 F.2d at 1583, due process required that as Davis’s supervisor he end the silence by giving prior fair notice that Davis’s conduct was subject to punishment and could result in the termination of his employment at the Library.
B.
Government officials are shielded from personal liability “if their actions did not violate ‘clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). What is “clearly established” is not to be defined at a “high level of generality,” Ashcroft v. Al-Kidd, — U.S.-, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011), and although “[the Supreme Court] do[es] not require a case directly on point, [ ] existing precedent must have placed the statutory or *402 constitutional question beyond debate.” Id. at 2083. The district court denied Mulhollan’s motion to dismiss the complaint on the ground of qualified immunity, agreeing with Davis that Mulhollan’s own conduct indicated the First Amendment right in question was sufficiently clear to him. The complaint alleged that Mulhol-lan asked Davis to “acknowledge that ... the First Amendment ... did not apply” to the publication of the two opinion pieces that were the basis for the termination of his employment. Compl. ¶¶ 56. As the district court found, “Mulhollan was at least aware of ‘a general constitutional rule already identified in the decisional law,’ ” Hope [v. Pelzer ], 536 U.S. [730,] 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 [ (2002) ], and that this constitutional rule might have applicability to [Davis’s] articles.” Mem. Op. at 40.
Although qualified immunity defenses should be decided at “the earliest possible stage in litigation,” Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), where the Pickering test applies, unless the “relative weight of the governmental interest and established constitutional rights ... [are] quite evident from the pleadings,” a decision may “properly await some evidentiary development” to determine “fact-dependent” interest balancing and thus may be inappropriate at the Rule 12(b)(6) stage. Navab-Safavi, 637 F.3d at 318. To the extent the Library and Mulhollan contend that the potential harm to CRS was clear from the complaint and the documents it incorporated by reference, see Appellant’s Reply Br. 18-19, they rely on factual assertions about the nature of Davis’s position and job responsibilities, CRS’s interest in maintaining the appearance of objectivity and lack of bias, and the content and tone of Davis’s opinion pieces — aspects of which Davis disputes and are either untethered to or inconsistent with the record now before the court. Under the circumstances, a remand is required to develop a factual record.
Accordingly, I would affirm the district court’s ruling that Davis’s complaint stated a valid Bivens claim and the denial of the motion to dismiss the complaint except I would remand for further fact-finding on the qualified immunity defense; I respectfully dissent.

. Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

. The court concludes that "Congress deliberately included Library of Congress employees in the 'civil service' ... [t]hen, just as deliberately, Congress chose to limit” the remedial provisions to the Executive Branch, see id. at 384. But these definitions were enacted in 1966, twelve years prior to the enactment of the CSRA. See Act of Sept. 6, 1966, Pub. L. 89-554, §§ 2101-2103; 80 Stat. 378, 408 (1966) (enacting Title 5, United States Code, entitled “Government Organization and Employees”). The legislative history of the 1966 Act indicates that Congress defined the "civil service” to "consist of all appointive positions in the executive, judicial, and legislative branches,” 5 U.S.C. § 2101(1)(1966), in order "to establish a basis of reference to employees in this title.” S.Rep. No. 89-1380, at 46; H.R.Rep. No. 89-901, at 26. Section 2102 of the 1966 Act, 5 U.S.C. § 2102, defined the "competitive service,” with some exceptions not relevant here, as "all civil service positions in the executive branch.” This was done simply to reorganize and centralize the Code’s definition based on two prior statutes, the Act of Jan. 16, 1883, ch. 27 § 7, 22 Stat. 406 (1883), and the Act of Nov. 26, 1940, ch. 919, title I, 54 Stat. 1211 (1940). See S.Rep. No. 89-1380, at 46; H.R.Rep. No. 89-901, at 26. Finally, section 2103 of the 1966 Act, 5 U.S.C. § 2103 (1966), provided that "[flor purposes of this title, the 'excepted service' consists of those civil service positions which are not in the competitive service.” Both the House and Senate Reports of the 1966 Act stated that section 2103 "is supplied for convenience. The ‘excepted service' has come to mean all employees not in the competitive service, for whatever reason.” S.Rep. No. 89-1380, at 47; H.R.Rep. No. 89-901, at 27. The only modification the CSRA made to the definitions in 5 U.S.C. §§ 2101-2103 was to add provisions regarding the Senior Executive Service, which are not at issue here. See CSRA § 401 (codified at 5 U.S.C. §§ 2101a, 2102(a)(1), & 2103(a)).

. The Congressional Accountability Act, guided by the principle that “Congress should be subject to the same laws as apply to a business back in a home state,” S.Rep. No. 103-397, at 6, applied, among other laws, "8 key anti-discrimination and employee-protection laws to the Congress”: Title VII of the Civil Rights Act of 1964; The Age Discrimination in Employment Act of 1967; The Rehabilitation Act of 1973; The Americans with Disabilities Act of 1990; The Family and Medical Leave Act of 1993; The Fair Labor Standards Act of 1938; The Occupational Safety and Health Act of 1970; and the Federal Service Labor-Management Relations Statute. Id. at 6; see 2 U.S.C. § 1371(b).

. The universal definition of "covered employee” in the Accountability Act does not extend to the Library of Congress, 2 U.S.C. § 1301(3), but various provisions afford Library employees protections under other federal laws. See id. § 1314(a)(2) (Employee Polygraph Protection Act of 1988); § 1315(a)(2) (Worker Adjustment and Retraining Notification Act); § 1316(a)(2)(B) (Veterans' Employment and Reemployment); § 1341(a)(2)(D) (Occupational Safety and Health Act of 1970).

. Prior to enactment of the Accountability Act, Library employees "enjoy[ed] most of the rights and protection of the antidiscrimi-nation laws, including the right to brings actions in U.S. district court,” id. at 4, although “enforcement mechanisms [] differed]” from those applicable to Executive Branch employees. Specifically, Congress had previously extended coverage to Library employees of: Title VII of the Civil Rights Act of 1964 (as amended in 1972), see 42 U.S.C. § 2000e-16(b), the Age Discrimination Act of 1967 (as amended in 1978), see 29 U.S.C. § 633a(a), and the Americans with Disabilities Act of 1990 ("ADA”), see 42 U.S.C. § 12209. Consistent with Congress’s concern for separation of powers, for Title VII and Age Discrimination Act claims, the Librarian had the powers normally given the Equal Employment Opportunity Commission. See 42 U.S.C. § 2000e-16(b); 29 U.S.C. § 633a(b). The Librarian was also authorized to establish remedies and procedures for claims under the ADA. See 42 U.S.C. § 12209(2).

. S.Rep. No. 103-397 accompanied a predecessor bill, H.R. 4822 in the 103d Congress. In introducing S. 2, the bill that ultimately was enacted, see Congressional Accountability Act of 1995, Pub. L. No. 104-1, 109 Stat. 3, 104th Cong., 1st Sess. (1995), the Chairman of the Senate Governmental Affairs Committee, before which the bill was pending, noted that S. 2 did not come to the Senate Floor following the normal committee referral process and "refer[red] Members to [ ] committee report No. 103-397” for legislative history of the previous bill because S. 2 was "a modified version of H.R. 4822.” 141 Cong. Rec. 684 (1995) (statement of Sen. Roth).

. Some House Members would have allowed personal liability suits against Members of Congress for violations of the laws covered by the Accountability Act. See 141 Cong. Rec. at 536, (statements of Rep. Goodling & Rep. Fawell). Instead, Congress provided that appropriations may be used as the sole source from which to pay awards or settlements of claims under the Accountability Act, see 2 U.S.C. § 1415(a), precluding personal liability by Members of Congress, see also 141 Cong. Rec. at 536 ("Members of Congress [shall be] indemnified for any damages, costs, or legal fees to which a prevailing party may be found entitled.”) (statement of Rep. Fawell). This approach is consistent with the practical result of Bivens actions, where the United States often indemnifies its employees sued pursuant to Bivens. Cf. FDIC v. Meyer, 510 U.S. 471, 486, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (noting that government expends a good deal of money indemnifying employees); Cleavinger v. Saxner, 474 U.S. 193, 208, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) ("[A]ny expense of litigation is largely alleviated by the fact that a Government official who finds himself as a defendant in litigation of this kind is often represented, as in this case, by Government counsel.”).

. 2 U.S.C. § 1410 provides that "[e]xcept as expressly authorized by sections 1407, 1408, and 1409 of this title, the compliance or noncompliance with the provisions of this chapter and any action taken pursuant to this chapter shall not be subject to judicial review.” For example, congressional employees must complete counseling and mediation before seeking judicial remedies. 2 U.S.C. § 1408. Section 1410 was included to prevent the "circumvention of th[e] Act by such methods as implied statutory, common law, or Constitutional causes of action in either the Judicial or Executive Branch.” H.R. REP. No. 103-650(11), at Part II, section 17 (1994). Because constitutional claims for alleged First Amendment violations are not included as a “provision[] of this chapter,” 2 U.S.C. § 1410, Davis's Bivens action is not precluded by this section. Cf. Ethnic Employees of Library of Congress v. Boorstin, 751 F.2d 1405, 1415 (D.C.Cir.1985) (holding that Congress did not intend Title VII to preclude suits "for constitutional violations [of the First Amendment] against which Title VII provides no protection at all”).

. Contrary to the court's suggestion, see Op. at 384-85, in the CSRA Congress provided that probationary Executive Branch employees would have review, through investigation by the Office of Special Counsel, of alleged constitutional violations. See Castle v. Rubin, 78 F.3d 654, 658 (D.C.Cir.1996); 5 U.S.C. §§ 1214(a)(1)(A) & (a)(3); 2302(b)(12) & § 2301(b)(2). This provides further evidence that Congress has not indicated that constitutional violations of probationary employees' rights should be without remedy.

. The Supreme Court instructed:
[E]ven though a person has no "right” to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly.”
Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (alteration in original)); see also Rankin v. McPherson, 483 U.S. 378, 383-84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); Keyishian v. Bd. of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

.See Study of Laws, Regulations, and Procedures at The General Accounting Office, The Government Printing Office, and The Library of Congress, at 121-22 (Dec. 31, 1996), available at http://www.compliance.gov/reports-studies/sec230/sec230_12-96.pdf.

. The four factors are: (1) whether the employee’s speech was "on a matter of public concern”; (2) "whether the governmental interest in” non-disrupted, efficient public services “outweighs the employee’s interest, as a citizen, in commenting upon matters of public concern, and the interest of potential audiences in hearing what the employee has to say”; (3) whether the employee’s “speech was a substantial or motivating factor in prompting the retaliatory or punitive act of which she complains”; and (4) whether the employer “would have reached the same decision even in the absence of the protected conduct.” O’Donnell, 148 F.3d at 1133 (internal quotation marks and citations omitted).